We'll now move to Case No. 2 of the day, No. 18-2843, United States v. Laut. We'll begin with Mr. Korovich. Mr. Korovich. Thank you, Your Honors. May it please the Court. My name is John Korovich, and I'm court-appointed counsel for Jason Laut. Mr. Laut's appeal asserts two key errors prevented him from having a fair trial. First, and as the government concedes in its opposition briefing, the government relied on evidence from a dropped product tampering incident involving a product tampering crime that occurred the year prior to the conduct charged in Count 38 to prove the elements of Count 38. When the government did this, it constructively amended Mr. Laut's indictment and deprived him of a fair trial. Second, Mr. Laut timely objected to the introduction of evidence concerning his past drug use under Rule 404B at his pretrial conference. However, the court did not apply the correct test as articulated by this court in United States v. Gomez. Specifically, the court did not require the government to provide a propensity-free line of reasoning when explaining why the motive exception applied to the context in this case. And secondly, and substantially, the court failed to conduct any of the companion Rule 403 analysis that is required every time the court looks at a propensity-based argument under Rule 404B. Each of these errors permits this court to reverse Mr. Laut's conviction. Turning now to the constructive amendment specifically. The constructive amendment, we have to look at four points because, of course, an objection was not made at the trial court. We need to satisfy plan error. First, was there an error? Here, when factors at trial permit a jury to convict for an offense other than that charged, we have an error. That's the first prong. Here, we have evidence presented of an uncharged 2014 conduct with the government saying that that goes to prove elements of the 2015 conduct under Count 38. And that's conceded in the government's opposition. And in addition to the government's opposition, that's not the only place we see it in the reckless indifference prong. We also see it, for example, at page 11624 of the appendix. Account 38, once again, ladies and gentlemen, all the evidence points to only one person with a morphine problem, certainly only one person with a fentanyl problem. Those 85 vials, that's the real deal. And, again, you'll recall that the 85 vials combines the 2014 damaged vials that were found with the 2015 vials that were found. So that's when we're grouping them all together. And this is something that we saw throughout the trial. So, again, here we have an error because separate conduct, separate crime, went to be shown for the 2015 conduct. That's the problem there. Mr. Korvec, I think this line of argument, you've made a bunch of really good points. What's on my mind is plain error, and I want to make sure you have enough time to address that. Can you focus on that aspect of it? Absolutely. So let's talk about why the error was plain. Under the standards of this court, an error is going to be plain if the law is settled, and then, as we know from Pearson, if we don't have facts particular to that case, which makes the application of that case to the court's precedent unclear. So here, the Lightening Standard for almost three decades has established the fact that if you bring in evidence from uncharged crime to suggest that that proves that conduct, that that's enough and that that's the standard. And that's been the clear standard relatively uncontested for the last three decades. In terms of why is this not a Pearson problem, what's different about this from Pearson? Here, in contrast to Pearson where we had a situation where the government made various clarifying statements to make sure that the jury understood that while it was presenting this other evidence, it was not to be used when determining whether or not convicted in that count, we don't have that here. In fact, we have the exact opposite. The government on frequent occasions emphasized that the conduct from 2014 and the conduct from 2015 could prove that charge, and that's materially different from what we see in Pearson where we have a situation where both in opening and closing statements the government is explicitly explaining that, hey, we presented this other evidence of this other gun, but that does not go to prove the charge count. We don't have that here. And without any type of clarifying statements, there's nothing that's going to make the application of the Lightening Rule unclear in our case, and we don't think that the government's presented anything other than that in its opposition. What do you mean by clarifying statements? So when we look at whether or not the facts of our case apply to a particular rule, first we need to look at whether or not there's a construction amendment, which we talked about previous, but then what we need to look at is are there other things that may have remedied this constructive amendment, such that, for example, in Pearson where the court said it was debatable whether or not a constructive amendment occurred. Here we don't have any of those clarifying statements from the court. We don't have any of those clarifying statements from the government. So when we have evidence and we say these 85 vials can prove Count 38, even though that's not what the indictment says, and we don't have anywhere else that explains what other purpose we're using this material for, we don't have anything that would put doubt or make unclear the application of the Lightening Rule in this context. I know you've argued you don't think that the 2014 evidence is not relevant to the wire fraud charges in Counts 1 through 6. In my sense, as your colleague on the other side may beg to differ with that. Well, I'd make two points, first off. First off, even if we find that there is some other conceivable relevant purpose for any other count, that doesn't cure or remedy the constructive amendment problem. As we see in Lightening, there was certainly a relevant basis to bring in other gun evidence. I mean, it certainly went to this criminal scheme in terms of the drug actions that were happening in that case. We know that guns are used for that. We know that guns have been admitted for these kind of drug dealer cases. There was a relevant basis. However, when the government explicitly told the jury to use that evidence for the purpose of convicting on Count 38, that became a constructive amendment problem. So that would be my first point. My second point, and to answer it a little bit more directly in terms of the Counts 1 through 6 wire fraud, we know that it doesn't go to wire fraud for two key reasons. First off, the indictment does not say that that goes to the scheme of conduct. The scheme of conduct is specifically about patient care reports, and it's specifically about the narcotics logs. That's the scheme that's alleged as part of the elements that charge. And second, as we talk about in our reply brief, a key point as well is that the tampering conduct does not fit within the scope of what would make sense for a wire fraud scheme. In a wire fraud scheme, they used patient care reports, most of which, by the way, from 2013, before they ever even found a tampered vial. And what they did is you make the edits on the reports to suggest that a vial had never been used so that you don't have to return it. Remember, at Memorial Hospital, we don't return used vials, or at least not at the time anyway. They didn't return the used vials. So if I have the ability to go into the software and change and say that a patient had used it, I don't ever have to bring it back. That's the way you don't get caught. You don't bring back a damaged vial. And we know from the wire fraud counts that if we don't have a situation where the wire fraud element, the actual using the interstate wires, goes to further the crime, that we don't have it. And we have had cases before, as we cite in our brief, where the specific charges of wire fraud that are not supported by that wire communication have been dropped off. So I don't think that's consistent with the wire fraud scheme here. You're at your rebuttal time. Did you want to save some time? Yes. I'll take 30 seconds just real briefly to touch on the 404B. Thank you for that. One thing I want to point on 404B that I really want to emphasize, we emphasized it quite a bit in the reply, is not only is there an issue with the fact that we don't have that propensity-free line of reasoning. We have the court and the government conceding that, hey, there might be a little bit of propensity here. They didn't go through the actual process of demonstrating that this mode of exception, which, by the way, wasn't even contested at trial, that this mode of exception could be found at a propensity-free line of reasoning. But also and significantly, there was no Rule 403 analysis done here at all. And why is that important? That's important because if the court would have gone through the Rule 403 analysis as advised by the court in Gomez, they would have recognized that this was not a motive case. This was an identity case. Mr. Laut did not say that whoever stole these drugs wasn't motivated to steal them. He didn't say that the person didn't understand how to steal them. All those other types of things that could happen in 404B we don't have. This is just simply that he was not the guy that did it. And as we see in all the cases, a simple denial of the charges is not enough to kind of waive the bringing in of this propensity. It's not opening the door. And with that, Your Honors, if there's no immediate questions, I'll reserve the rest for rebuttal. Very good. Thank you. Mr. Killian. May it please the Court. My name is Randall Killian, and I represent the United States in this matter. There are three things that I would like to talk to you about today. The first is the constructive amendment argument made by counsel. The second is the introduction of 404B to show motive that was allowed by Judge Herndon. I'm going to start with what I believe to be the easiest of the two, and that is the 404B. The defense argues, or excuse me, the appellant argues that there is evidence in this case dealing with the, well, he calls it the multitude of evidence and argument made regarding allowed sediction, jonesing, and use of painkillers. Defendant does not, or appellant does not argue that the drug test that was administered by Memorial was inadmissible. He admits it was admissible. He argues instead that the issues before the court were the fact that the government continued to drive home this analysis or argument that the defendant was a drug abuser, that he had jonesing issues, and therefore it was propensity evidence. That was not the trial I was at. We had a final pretrial conference where we discussed during that final pretrial conference that the government might intend to get into 404B for motive. Appellant now argues that motive wasn't an issue because he conceded it. Well, we didn't have a stipulation to that. We still had to prove our case. And motive and identity are basis for 404B. But it is very important in this case where appellant argues that the government continued to do this. We did intend to do that. We had asked the judge that we might do that. We didn't do that. We introduced the testimony of a police officer by the name of Ralph Jones from Sparta Police Department who testified about changed conditions of Lout after he had neck surgery. We did not put on evidence that we had about his withdrawals, about his pill use, about his addiction, the individuals we were going to have to testify regarding his drug use. We did not put on any of that evidence. So with regard to the 404B evidence that came in, I just simply argue that we did not do what the appellant is now arguing. Was the point of the introduction of the evidence on the changed condition after the neck surgery to either state affirmatively to the jury or to make the point to the jury affirmatively that he was a drug user of some kind? And therefore, I mean I see that relevant to the identity issue. Even if you frame it as an identity issue as the defense does. But what was the point of the changed condition evidence? When this trial started out, Your Honor, the government put on a number of witnesses. It was a seven-day trial. We had two and a half hours of closing argument. Officer Moore came in and testified about a number of things, about how the vials had been tampered with. And yes, we talked about after his neck surgery, he would go out with Lout because he was a police officer in Sparta, Illinois. MedStar was an ambulance company in MedStar, in Sparta. He would see how he changed. So to the extent that goes to identity, to the extent that that goes to 404B as far as motive and drug addiction, we never said drugs. But was the point of the changed identity to suggest drug use? I mean, who cares about changed identity? Not change, change in behavior. His appearance. And absolutely it was, Your Honor. Yeah. That is the only 404B that we introduced. And that's what I wanted to get to. In that 404B world, was it the case that the government was thinking about and giving notice of a whole plethora of types of things, but that a trial only chose to do a sliver of that? That's exactly right. All the things that counsel argues, we talked about at the final pretrial conference. We did none of those things in trial. I mean, we have a seven-day trial. Other than the testimony of the Sparta police officer, I don't believe there's anything in that transcript that would indicate things like withdrawal, jonesing, abuse, any of those types of things. The appellant also argues that the drug test that was administered also has a limited value because multiple other employees of MedStar tested positive for drugs. That's true. The defendant in this case, Lau, tested positive for fentanyl. One tested positive who worked in the garage for cocaine, and two tested positive for drug prescriptions that they had. So I humbly submit that with regard to the 404B argument here, it just simply did not happen the way that the appellant argues it. I do want to talk about another thing that was in the reply brief, and that is that the government's case was weak. That plays into the point error analysis. That plays into a number of things, and because my time is very limited, I want to make sure that I go through this. The appellant argues that both the count 38 and the overall scheme to defraud was weak, claiming only documentation errors, drug tests, and propensity evidence. There was not. To the extent that it was propensity evidence, it was only what Officer Rothmore testified. The drug test showed Laut was the only one tested positive for fentanyl. The documentation errors, this is a case where when MedStar and Memorial Hospital went back to address and try to determine what happened, they found that patient care reports that are entered in the field by paramedics had been filed, and Jason Laut, using his administrator access, went in days, weeks, or even months later and changed those patient care reports to show that people who had not received fentanyl or morphine had actually received fentanyl and morphine. We called the owner of MedStar Ambulance, an individual by the name of Chuck Kelly. He came in and testified and recalled one of the specific edits where a patient was horribly injured, and during the course of the treatment, Laut did show up. However, he testified that no morphine or fentanyl was given. However, that patient care report that was completed by Chuck Kelly was altered days later to indicate that fentanyl had been given. There was overwhelming evidence of patient care reports being falsified. The narcotics logs are documents that go with the narcotics box to show distribution of controlled substances. It is the inventory that is necessary. Those were falsified. He would indicate that individuals received fentanyl and morphine who did not receive fentanyl and morphine. Patients came in and testified, fell out of chair, passed out of church. It said the narcotics log would indicate that Jason Laut gave those individuals fentanyl and or morphine. Mr. Kelly, on the constructive indictment, out of curiosity more than anything, why did the government drop in the second superseding indictment the 2014 tampering charge? Well, the accounts that we had all involved fentanyl vials that had been tampered with. They were seized at two different times. We were facing a trial, and we had difficulty with the DEA laboratory. The vials had to be sent off to a special testing laboratory because of the dangerousness of fentanyl. We were having a problem getting the 54 vials from that first tested. We knew we were going to have the vials from the 28 tested and ready to go to trial. It was just a game-time decision we went ahead and dropped. The 28 relate to 2015, right? The 2015. Those vials. So we just made a game-time decision. As it turned out at trial, we did have that. I do want to point out that if we hadn't had account 38, all of those vials would have been administered because the scheme to defraud included theft. And no matter how you look at it, when you stick a needle into a vial and pull out fentanyl, you're stealing it. It doesn't matter that it can also be utilized as evidence of tampering. And as we get to that, the appellant argues, and I urge whoever looks at this to go through the transcript, the appellant argues that we relied upon this evidence from 2014 as evidence to convict on 2018. He says that we conceded. If any fair reading of the government's brief points out that that is just the writer of the brief for the government indicating what I said at trial, this was seven days of trial, two hours of closing argument. I did, in fact, combine the 54 and the 24 vials in that argument. And he says that we did that to show the reckless indifference. I have 42 seconds. I will tell you that with regard to the reckless indifference, this is a paramedic supervisor who stuck a needle, not sterile, into a fentanyl vial. He pulled out the fentanyl. He placed back into that vial saline. He placed those back onto ambulances throughout the southern region. He did that knowing that some person who was the most horribly injured out in the streets would receive those vials. Because make no mistake about it, we didn't introduce evidence because we couldn't. But just the mere numbers of vials that had been tampered with, somebody got one of those vials. And to think that we needed evidence from 2014 to convince a jury that that was reckless indifference on the part of a supervisory paramedic to do that is ludicrous. Thank you, Mr. Killian. Excuse me? Thank you. Thank you very much. We'll now move to Mr. Korovec for any rebuttal. Thank you, Your Honors. I'll try to be brief. I want to touch base on the constructive amendment issue first here. Again, for that first part of the prong, we do have a concession by the government. It was used both in the opposition, and we just heard it from the testimony now, that 2014 and the 2015 vials were combined, and they were combined to be able to show, again, this reckless indifference, which we just heard from counsel a moment ago. That's the first part. In terms of whether or not there was the argument just now about whether or not it substantially impacted him, we go through our reply brief, we direct the court, let's look at the 2015 evidence, let's look at the 2014 evidence, there's a material difference between the veracity of these and why. Because in 2015, not only does the drug test not have metabolized, so it doesn't suggest that it happened two months previous, but we also have a vial that was never recirculated. Taking a vial and stealing it and not recircling is not the same thing. That's the DOJ's own guidance. That's also congressional report says the same thing. That's not enough, so that is significant there. As for the 404B evidence, to Your Honor's question about identity, could it go to show identity, what I would posit is that the cases that usually look at identity are going to look at one of two things that I've seen anyway. One is modus operandi, having used other things that are not fentanyl, not morphine, not through tampering, just having used it as part of a prescription is not a modus operandi for using the technique that was just described to you now. And then two, when we look at a situation of being able to identify one person over other competing potential suspects, we have multiple people here that had been found that the drug use that they had, they failed the drug test as well. With that, Your Honors, I see I've lost my time, unless there's any other questions. Thank you, Mr. Korobek. Thank you, Mr. Killian, as well. Mr. Korobek, you have the great thanks of the court for your work as appointing counsel. I appreciate that. Thank you.